Morton I. **THOMAS** et al., Plaintiffs,

v.

**DURALITE COMPANY, INC.,** a New York corporation, et al., Defendants.

**Civ. A. No. 623–69.**

United States District Court,
D. New Jersey.

Oct. 29, 1974.

---

Pitney, Hardin & Kipp by William D. Hardin and William H. Hyatt, Jr., Cary J. Frieze, Newark, N. J., for plaintiffs.

Golenbock & Barell by Arthur M. Handler, Robert S. Goodman, New York City, for defendant Duralite Co., Inc.

Sidney Krieger, Newark, N. J., for defendant Duralite Co., Inc.

Cole, Berman & Belsky by Morrill J. Cole, Thomas J. La Conte, Paterson, N. J., for defendants Bertram R. Lesser and Irving H. Zakin.

## OPINION

STERN, District Judge.

Plaintiffs: Morton I. Thomas, a resident of New York; Edco Surgical Supply Co. Inc., a New York corporation; and Temco Products, Inc., a New Jersey corporation, sue Defendants: Duralite Company, Inc., a New York corporation; Bertram R. Lesser and Irving H. Zakin, residents of New York, for damages incurred by the sale of stock in Duralite Company, Inc. and Randolph Avenue Corporation, a New Jersey corporation which was later merged with Duralite on November 21, 1968, in accordance with an agreement of sale dated June 18, 1968.

This action arises under Sections 10(b), 20 and 29(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j, 78t and 78cc(b) as amended) and the regulations promulgated thereunder by the Securities and Exchange Commission, particularly Regulation § 240.10b–5 (17 C.F.R. 240.10b–5), and involves an amount in controversy in excess of $10,000.00, exclusive of interest and costs. Jurisdiction is conferred on this Court by Section 1331 of Title 28 of the United States Code, and Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. Section 78aa as amended). A claim for fraud under New Jersey law is annexed on the theory of pendent jurisdiction.

The principal parties in this litigation, Morton I. Thomas and Bertram R. Lesser, jointly founded the Duralite Company, Inc. in 1949. In 1949 Lesser and Thomas were close friends who worked together at the Sikorsky Aircraft Company. When they decided to establish their own company to manufacture aluminum chairs, Lesser took a leave of absence from Sikorsky and during that time Thomas paid over half his paycheck to Lesser. When Lesser's leave of absence had expired, but the new business had not yet been established, Thomas took a leave of absence and Lesser, in turn, sent half his paycheck to Thomas. (Tr. 1976–1977)

Duralite was established in 1949 in a storefront in Brooklyn. By dint of their joint efforts, Lesser and Thomas eventually moved to a loft in the Bronx. The partners were very close. They shared the same desk and there was a complete interchange of all information and decision-making in a spirit of total harmony. (Tr. 1977)

At first Duralite sold only to a company named Finkel. Over the years, however, the company began to sell to the trade in general. By 1958, the combined efforts of Lesser and Thomas had improved the annual sales of Duralite to approximately $2.5 million a year.

By this time, without any planning or design, Lesser and Thomas had divided the responsibilities of their expanding business. Thomas was primarily the production man, while Lesser was pri-

marily concerned with financial matters, including the obtaining of lines of credit. As a purely arbitrary matter, Lesser had assumed the title of President while Thomas took the title of Secretary-Treasurer.

About 1958, Irving Zakin joined the firm. Zakin, formerly with the Finkel company, had as his principal responsibility Duralite's expanding sales effort. He soon became Vice-President in charge of Sales, and the atmosphere among all three parties at that time may best be described in terms of Zakin's own testimony:

Q. Describe your participation on that team during the fifties and into the middle sixties.

A. It was a very close working relationship. Mr. Thomas and Mr. Lesser and myself. There was constant communication, constant communication on a daily, hourly basis; I reciting my needs, Mr. Lesser his requirements, Mr. Thomas his requirements, so that it was a uniform, concerted effort directed towards an end goal which was the manufacture and the selling of the product of our manufacture. This was done typically in a team manner, in a team effort.

(Tr. 2700, lines 13–22)

The business of Duralite flourished throughout the 1950's. By 1960 it was evident that Duralite's Brooklyn facilities were insufficient to meet the ever-increasing sales volume. Lesser and Zakin sought and found a piece of property in Passaic, New Jersey, which was purchased for the purpose of providing the needed expansion of facilities for Duralite. This property comprised 11 acres, on which stood buildings accommodating approximately 480,000 square feet of usable space. In order to effectuate the acquisition of this property, Lesser and Thomas formed the Randolph Avenue Corporation, each purchasing 50% of the stock. In 1960 the Randolph Avenue Corporation purchased the Passaic property for $600,000.00. The total purchase price was financed by means of two mortgages.

Duralite became Randolph's only tenant. It is clear that there was never an arm's-length, lessor-lessee relationship between the two corporations, Randolph and Duralite. Rather, since Lesser and Thomas owned all the stock of both corporations, Duralite occupied Randolph's premises and paid as rent whatever was necessary for Randolph to meet its mortgage payments, taxes and maintenance costs.

In 1963 the annual sales of Duralite were approaching $6,000,000.00 and the company, at the height of its season, employed more than 1,000 people. (Tr. 32) The relationship between Lesser and Thomas remained amicable. In spite of the size of their organization, they continued to share the same office and secretary, and took lunch together daily.

By this time, in addition to the title of President, Lesser had assumed the title of Treasurer from Thomas in order that the corporate hierarchy conform more nearly to Lesser's expertise in the financing end of the business. Thomas took the title of Executive Vice-President and maintained his position as Secretary in Duralite. Zakin continued in his post of Vice-President in charge of Sales of the Duralite Company.

A word must now be said about the nature of Duralite's business, particularly about its business cycle. During the period pertinent to this case, Duralite was primarily in the business of designing, manufacturing and selling summer furniture. There is no dispute in the testimony about the fact that the business cycle of Duralite would begin in late August or early September, looking towards the sale of summer furniture during the following spring and summer, and that the sales of summer furniture by Duralite would be substantially concluded by the July 4th weekend. Thus, Duralite's cycle of business ran from late August until the July 4th weekend.

It is also not disputed that the sales of Duralite were made to roughly three categories of buyers.

The most important buyer was Sears, Roebuck & Co., which accounted for

20%–30% of Duralite's gross sales annually. There is testimony in the record, which the Court finds to be credible, that Duralite would receive the Sears order by early September and would immediately process it into production. The finished Sears merchandise would be stored in a Sears warehouse on the Duralite premises where it would remain subject to the various demands of Sears outlets. In this way, the merchandise for Sears was available when Sears needed it, and by placing it in the warehouse, Duralite was able to finance 80% of the inventory it delivered to the Sears warehouse. The remaining portion was paid when Sears physically removed the goods. By June 1st of each year Duralite had produced as much as 90% of the annual Sears order. (Zakin deposition, pp. 13–14)

The next category of Duralite customers was such large department stores as Woolworth, Vornado, S & H Green Stamps, etc. These stores accounted for approximately 50%–60% of Duralite's sales volume. Although these orders came in substantially later than the September Sears contract, by the end of January most production for these large customers was accounted for by Duralite (Tr. 51; Zakin deposition, p. 18), and heavy volume shipments were made throughout the months of February, March, April and May.

The remaining 10%–30% of Duralite's business was conducted with relatively smaller houses. The major portion of these orders was received about March and April, although shipments were made by Duralite to such firms throughout the month of June and even, in a relatively negligeable amount, in the month of July.

It has been necessary to detail these transactions because one of the issues between the parties is whether it was possible, by the end of February each year, for the management of Duralite to know with a reasonable degree of certainty whether the year would be a profitable one. Thomas has repeatedly testified that not only was such knowledge possible for management, but that each February with the exception of 1962 when unexpected labor difficulties arose, Lesser did in fact predict with good accuracy whether Duralite was having a profitable or an unprofitable year.

Lesser, Zakin and other witnesses have testified to the contrary. Indeed it is the defendants' position that because of the critical June sales period, and the open question of how much inventory was left at the end of the season, it was not possible to accurately forecast Duralite's annual earnings until October, three months after the overall sales season ended, when the inventory was actually counted. Thus it was Lesser's testimony, corroborated by the testimony of Marvin Weinstein, Comptroller of Duralite, and others, that in a year in which Duralite was eventually to show a $200,000.00 profit, it was not possible to know even that there had not been a loss until the inventory itself was physically counted in October.

As this opinion will explain, a decision on this issue is not necessary to the determination of this lawsuit. Nonetheless, so that the Court's findings of fact will be complete, this Court finds as a matter of fact that whether or not Lesser had the information necessary to enable him to predict the profitability of Duralite in February, he could certainly do so by June 18th of each year. In spite of the welter of variable factors which defendants have pointed to, including the vagaries of weather, this Court, after having listened to the testimony, studied the monthly reports (P–42 through P–58) and listened to detailed explanations concerning the virtual day-by-day business of Duralite, is totally persuaded that the management of this company knew full well whether they were in a profit or a loss situation within two weeks of their season's end, and that such a determination did not have to await the actual physical count of inventory some three months after Duralite's season had ended and the new season had already begun.

To conduct its business, Duralite required heavy independent financing which its shareholders could not provide. One of the primary lines of credit which Duralite enjoyed was a $500,000.00 loan from William Iselin and Company, Inc., as well as a factoring of its accounts receivable by Iselin. This, the financing of the merchandise in the Sears warehouse, and a line of credit from Channelmaster, a primary supplier, were Duralite's main sources of credit.

The relationship between Lesser and Thomas, which began in 1949, continued throughout 1964, despite the fact that 1964 was a disastrous year for Duralite. In 1964 Duralite sustained a loss of roughly $600,000.00. The magnitude of this loss threatened the very existence of the firm. For a period of time it was unclear whether Duralite could maintain its lines of credit and meet its obligations on other indebtedness.

In January of 1965 Lesser and Thomas worked out an arrangement with Harry and Louis Resnick, the principals of Channelmaster. Duralite owed a substantial sum of money to Channelmaster, nearly half a million dollars, and for reasons of their own, the Resnicks were interested in preventing any financial collapse of Duralite at that time. By the terms of the agreement between the parties in January of 1965, the Resnicks forgave Duralite's obligation to their firm. Additionally, the Resnicks contracted to guarantee personally the $500,000.00 obligation of Duralite to Iselin, in return for which Lesser and Thomas each granted the Resnicks options on 50% of the Duralite and Randolph stock owned by Lesser and Thomas. By the terms of these agreements (P–1, P–2), the Resnicks could exercise their options on the Duralite stock by the payment of $50,000.00, and could exercise their options on the Randolph stock by the payment of $25,000.00. By the terms of both agreements, the options could be exercised "while the loan from William Iselin and Company, Inc. to the corporation, or any portion thereof, remains unpaid, or at any time within five years of the time hereof, whichever period shall be longer."

It is clear, as will be developed later, that these options were granted to the Resnicks for the sole purpose of giving them some security for their personal guarantee of Duralite's obligation to Iselin.[1]

The disastrous loss of 1964 strained the relationship between the hitherto close friends, Thomas and Lesser. As 1965 wore on, Thomas withdrew from the mutual friendship. He suddenly announced to Lesser that he would no longer take his lunch with him. The two men found it difficult to converse. This situation neared a head when Thomas announced to Lesser that he wished a separate office. By the end of 1965 the two men could no longer work together and found it difficult to manage the affairs of Duralite jointly. Not only did they take separate offices, but it was now necessary for them to consult with other employees of the firm to resolve corporate business decisions which Lesser and Thomas had previously made in a joint and easy fashion but could no longer agree on at all.

The fracturing of 16 years of a close and harmonious working relationship resulted in predictable acrimony. Thomas made overtures to Zakin, and to Duralite's production manager, Abraham Zwiekel, to support him in an attempt to wrest the presidency of Duralite from Lesser, and there is evidence in the record to support the conclusion that Lesser played court to Zakin and Zwiekel in an attempt to preserve his position.

During this period of time both Lesser and Thomas agreed to transfer shares of Duralite to both Zakin and Zwiekel, and 10% of the shares of Randolph to Zakin. This transfer was approved by the Resnicks on December 8, 1965 (P–

1. The Resnicks guarantee of the $500,000.00 Duralite loan was not the only security procured by Iselin during January 1965. Both Thomas and Lesser pledged all their Duralite shares as additional security for Iselin's loan on January 28, 1965. (D–75)

3). The test of strength between Lesser and Thomas occurred at the December 17, 1965 meeting of the Board of Directors of Duralite. At that time Thomas stood for the presidency, but with Zakin's and Zwiekel's support, Lesser maintained his position. Shortly thereafter, Lesser fired Thomas' secretary, Doris Paley, without consulting Thomas, and Thomas, having lost his bid for the leadership position, and having tasted Lesser's control, resigned and left the executive management of Duralite before the end of 1965. Lesser, according to his trial testimony, was "very hurt" by Thomas' course of conduct. (Tr. 1974)

It is important to note that at this point Thomas and Lesser each owned 45½% of the stock of Duralite, and each owned 45% of the issued and outstanding stock of Randolph.

As might be expected, negotiations were promptly undertaken to eliminate any participation by Thomas in the Duralite-Randolph enterprise. The basic plan was for Thomas to sell and Duralite to buy up Thomas' interest in these two companies. On or about December 22, 1965, Thomas was offered a total of $124,132.00 for his stock in the two corporations: $85,140.00 for his Duralite stock and $38,992.00 for his Randolph stock. He rejected this offer, primarily because the principal asset of Randolph, the real estate which underlay the offer of $38,992.00, was valued at $555,000.00 on the corporate books, and was assessed at $1.3 million by the New Jersey State Board of Tax Appeals. It was Thomas' testimony, which the Court finds to be credible, that he was at that point interested in selling only his Duralite stock and not his interest in Randolph.

While the negotiations continued, Lesser, of course, continued to run both Duralite and Randolph. Thomas launched into business for himself. He formed a corporation, Temco Products, Inc., which manufactured and sold convalescent aids made from aluminum tubing. Thomas also formed a business relationship with one Donald Edwards, who was the principal of Edco Surgical Supply Co. Edwards and his firm had been customers of Duralite whom Thomas had brought to Duralite, and Thomas eventually deepened his relationship with Edwards to the point that, by the end of 1967, Thomas owned 50% of Edco and Edwards owned 50% of Temco.

Throughout the spring of 1966 negotiations between Thomas and Lesser were dormant. It is the position of the plaintiffs, and it was Thomas' testimony, that throughout this period Thomas asked for and was refused relevant financial documents and information concerning the business of Duralite. The credible evidence does not support this contention. The Court finds that Thomas, during this period of time, was not refused any relevant financial documents he requested, other than certain internal Duralite monthly status reports, which Thomas' own accountant, Mr. Louis Lieberman, testified only Duralite management was entitled to. In sum, he was refused nothing except certain monthly internal reports which as a stockholder and not an officer he was not entitled to receive. Thomas called Lieberman, his accountant, who admitted as much on the witness stand.

Pursuant to his stated intention, by the beginning of 1967 Thomas offered to sell his Duralite stock, alone, for $145,000.00 (P–8). Lesser countered with an offer of $100,000.00 for Thomas' Duralite stock alone (D–32), stating that Duralite had encountered severe difficulties in its fulfillment of a cot contract for the Department of Defense. In response Thomas lowered his asking price to $115,000.00.

In a letter dated April 17, 1967, Thomas reiterated this offer:

The book value as of July 31, 1966 using standard accounting practices, the value of my stock including the exercise of the Channelmaster option, amounts to $145,450.00. That represents the minimum figure at which my stock could be bought if we were to evaluate it as of this date. Two

months ago, because of the uncertainty of the government contract, I arbitrarily discounted this figure approximately $30,000.00 and offered to take the figure of $115,000.00. . . It is my intention to continue with the $115,000.00 figure so long as these negotiations are concluded within a reasonable time. In the event that this is not possible, you may then consider that the minimum figure will revert to $145,450.00 until such time as a new financial statement is issued, at which time further adjustments would be proper. . . .

Thus, as of April 17, 1967, Thomas, although he proclaimed the belief that his Duralite stock was worth $145,000.00, was willing to sell it for $115,000.00, and Lesser had raised his original offer from $85,000.00 to $100,000.00. Following the April 17, 1967 letter, and additional negotiations, a contract dated December 4, 1967 was signed whereby it was agreed that Duralite would purchase all of Thomas' stock for the sum of $112,500.00. The contract was expressly conditioned on the waiver by Iselin and the Resnicks of their respective security and option interests in Thomas' stock. (P–10).[2]

It is important to note that the figures which have been mentioned in terms of offers for the purchase or sale of Thomas' Duralite stock (that is, the $100,000.00 which Lesser was offering Thomas in March, the $115,000.00 which Thomas demanded in April, and the $112,500.00 which the parties agreed upon in December of 1967) were not contemplated to be the net amounts payable to Thomas. The parties at all times recognized that, whatever Thomas was to receive, Duralite also had a valid claim against Thomas for nearly $16,000.00 ($15,583.06) for an outstanding officer's loan owed by Thomas to Duralite, as well as monies due Duralite

from Edco based on prior orders by Edco for merchandise, some of which Duralite had delivered to Edco, some of which Duralite held in inventory which Edco refused to accept, but none of which had been paid for. The amount due Duralite from Thomas based on his unpaid officer's loan was never in dispute. Similarly, it was never disputed that Edco owned Duralite money for goods sold and delivered and for goods ordered by Edco but refused by Edco, although the precise amounts of the latter two categories of obligations were a matter of continual negotiation between the parties and were intertwined with the bargaining on the value of Thomas' stock.

The agreement of December 4, 1967 apparently concluded the transaction concerning Thomas' interest in Duralite. By terms of the agreement it was recognized that Thomas' shares were worth $112,500.00, and that Thomas owed Duralite the amount of his officer's loan, Edco owed Duralite $22,509.75 for goods sold and delivered from Duralite to Edco and for raw materials which Duralite was holding for Edco, payment for which was computed under a formula established by the contract (P–10).

The agreement was never consummated. During fiscal 1967 Duralite suffered a net loss of $409,000.00. Although Lesser testified that both he and Thomas knew of this loss before they signed the December 4, 1967 agreement, the agreement itself could not be effectuated because neither Iselin nor the Resnicks would permit the transfer of the stock from Thomas to Duralite at a time when Duralite was in such a precarious financial position.

It is beyond dispute that both Lesser and Thomas were concerned, and justifiably so, about the continued viability of Duralite as a result of this substantial loss for fiscal 1967. Duralite, having

---

2. It is understood that said stock is presently pledged as security with William Iselin & Co., Inc. and is subject to an option to purchase some of said stock in favor of Harry and Louis Resnick. This agreement is contingent only upon the obtaning of a release from said agreements satisfactory to permit the transfer of said stock in accordance with the warranties provided for herein.

overcome a $600,000.00 loss in fiscal 1965 which came perilously close to finishing it, just two years before, now faced a loss very nearly as great. There was no question that if Iselin & Co. did not continue Duralite's line of credit, the firm would have no alternative to bankruptcy.

It is not disputed that either in late December of 1967 or early January of 1968 Thomas called Lesser and asked for a meeting with the intention of negotiating for the sale of his Randolph stock. It is not disputed that, in preparation for that meeting, Lesser developed a written proposal dated January 5, 1968 (P–11), which estimated the current value of the Randolph property at $800,000.00; after deducting for mortgages, taxes and other obligations, Lesser placed its net value at $342,785.00. Lesser's computation discounted Thomas' interest for the Resnicks options, stating it as $89,000.00. Thereafter, this figure was further reduced by Lesser under the following caption:

### Contingencies of Value

1. Existing third mortgage on property guarantee Duralite's obligation to William Iselin.

2. Possible inability to sell property within one year.

3. Undetermined course of action of controlling interest (Resnicks).

4. Reduced value in event of distress sale.

5. Possible foreclosure if mortgage payments are not kept current.

Due to the above, a 20% discount is considered equitable for a cash payment. Therefore, Thomas' interest is valued at 80% of $89,000.00 or $71,600.

(P–11)

Lesser brought his proposal to a meeting with Thomas at the Norselander Restaurant. There is a divergence between Lesser and Thomas as to what was said at this meeting. After hearing the testimony and reviewing the relevant documents, particularly P–11, this Court finds that Lesser revealed the magnitude of the loss that Duralite had just sustained to Thomas and conveyed to Thomas the clear impression that, at this point, Thomas' equity in Duralite was worth nothing; indeed, that it was worth less than nothing, for Lesser represented that Thomas had a minus equity of $19,937.00 in Duralite. Furthermore, while the word "bankruptcy" may not have been used directly in dicussing the affairs of Duralite, there can be no question that the whole impact of what Lesser had to tell Thomas was that there was considerable question whether Duralite could continue in business. Thus, in the evaluation of Thomas' interest in Randolph, Lesser had made reference to "possible inability to sell property within one year" and "reduced value in event of *distress* sale," and "possible *foreclosure* if mortgage payments are not kept current." (Emphasis added)

Duralite was Randolph's only tenant. The only conceivable way that there could be a failure to make current mortgage payments, or a distress sale, or, for that matter, the necessity to sell the property within one year, would be if Randolph's only tenant and only source of income, Duralite, became financially unable to continue paying the taxes and mortgage payments due on Randolph's property.

Lesser in fact told Thomas that his stock was worthless and that Thomas should consider turning it in for nothing. In response Thomas indicated that he would not do so but would seriously consider exchanging his stock for the sum total of his personal responsibility under his officer's loan and the receivables due Duralite from Edco, or a total of $42,000.00 as Thomas and Lesser then reckoned it. (Tr. 239–246) Thomas made his offer subject to verification by his accountant, Lieberman, of Duralite's $409,000.00 loss.

Lieberman verified the loss, but advised Thomas that his equity in Randolph should be $91,272.00 (P–12).

As a result of this conversation, it is clear that Thomas abandoned his claim for $112,500.00 for his Duralite stock and was content to exchange it for whatever liabilities he and his corporation, Temco, owed Duralite. It is also clear that, fearing imminent bankruptcy by Duralite and the consequent insolvency of Randolph, Thomas abandoned his earlier estimate of the value of his interest in Randolph and totally capitulated to the offer which Lesser advanced to him in the context of a conversation in January of 1968, at a time when both Lesser and Thomas were rightfully concerned about the solvency of both Duralite and Randolph. There is no question about the fact that Thomas' sole interest, commencing in January and continuously thereafter until June 18, 1968, when he entered the contract of sale for his Randolph and Duralite stock, lay in discharging his and Edco's obligations, which he feared could momentarily fall due if Duralite went into bankruptcy, and in obtaining whatever compensation he could in addition to the discharge of these obligations for his Randolph and Duralite stock.

This conclusion is inescapable based on a meeting which took place in April of 1968 among Lesser, Thomas and Donald Edwards.

Before turning to that meeting, however, it is necessary to consider the testimony of James H. Kaltsas. In 1967 and throughout 1968, Kaltsas was the President of a company known as Prest-Wheel, a lawn furniture manufacturing company which he and his two brothers had founded in 1947. Prest-Wheel, in competition with Duralite, manufactured and sold lawn furniture. In addition, Prest-Wheel was a supplier of the aluminum tubing which manufacturers of lawn furniture used in assembling their finished products.

The testimony is clear that in the latter part of 1967 Kaltsas became interested in either merging Prest-Wheel with another company, or disposing of his family's interest in Prest-Wheel entirely. It is likewise clear that throughout 1968 he was engaged in negotiations with a conglomerate, Giffen Industries, aiming toward Giffen's purchasing the shares of Kaltsas and his two brothers in Prest-Wheel and taking over that firm.

While it is not possible to fix precisely the date on which those negotiations commenced, it seems clear that by January of 1968, or shortly thereafter, Kaltsas was engaged in serious negotiations with Giffen Industries. The negotiations were formally concluded by the signing of a contract in September of 1968 (DD–31), by the terms of which the three Kaltsas brothers conveyed their shares in Prest-Wheel to Giffen Industries for approximately 250,000 shares of lettered Giffen stock (Giffen was at that time selling for approximately $60.00 a share).

There is no dispute that the agreement was consummated on September 4, 1968. There is dispute among the parties as to when Kaltsas and Giffen reached a meeting of the minds. The Court finds that the testimony of Kaltsas is to be believed and that the parties, that is Kaltsas and Giffen Industries, reached a meeting of the minds in April of 1968, although the transaction was not finalized until September of 1968, because one of the Kaltsas brothers was demanding cash instead of lettered Giffen stock.

Kaltsas testified, and the Court finds his testimony to be credible, that Monroe Cooperman, then Executive Vice-President of Giffen Industries, represented to Kaltsas during the negotiations that Giffen Industries was seeking to expand in the recreational field and that, after the merger, James Kaltsas would play an important role in Giffen's aggressive acquisition policy in the leisure time field. Furthermore, Kaltsas testified that once it became clear in April that there would be a merger, Kaltsas began to undertake missions for Giffen Industries in search of possible future acquisitions for Giffen, even before the actual merger in September of 1968. Thus, throughout May, June and

July of 1968 he made several trips on behalf of Eli Timoner, then Giffen's Chairman of the Board, to examine companies in several states and in Canada. Both Cooperman and Timoner, who also testified at trial, conceded, albeit reluctantly, that Kaltsas had undertaken such explorations and missions for Giffen even prior to the formal acquisition of Prest-Wheel by Giffen. Cooperman also reluctantly conceded that he may have given Kaltsas to understand that Giffen had plans for Kaltsas in its corporate management. (Tr. 3007, 3010–3012)

Kaltsas testified that about November or December of 1967 he first spoke with Irving Zakin about the possibility of Prest-Wheel merging with Duralite. The conversation, as he recalled it, took place in the Duralite showroom in New York. He testified that Zakin's response was that he thought that it was a good idea, but that Zakin would have to discuss it with his "partner."

Kaltsas testified that he continued to have conversations about possible mergers between Prest-Wheel and Duralite with Zakin. He testified that in January of 1968, at a furniture show in Chicago, he had another business conversation with Zakin. He testified that Zakin was anxious to discuss and to continue discussions about such a merger. (Parenthetically, Exhibit D–31 introduced by the defendant after Kaltsas left the witness stand establishes that there was such a furniture show in Chicago in January of 1968).

Kaltsas further testified that he and Zakin had another meeting, this time in April of 1968 at another show in New York. As noted, by this time Kaltsas knew that he had achieved, or was very close to achieving an agreement with Giffen. He told Zakin about the prospective merger between his firm and Giffen. Zakin and Kaltsas discussed the possibility of Giffen's taking over Duralite. Kaltsas questioned Zakin about the volume of Duralite's gross sales, and Zakin responded that he expected to do $6,000,000.00 and to show a profit of 4%–5% before taxes in fiscal 1968. At this meeting, in April of 1968, Kaltsas told Zakin that he estimated that Giffen would give $2,000,000.00 to $3,000,000.00 for the Duralite stock, based on Zakin's figures, and that he would "see to it" that Giffen took over Duralite once his own affairs with Giffen were concluded. He was as good as his word.

Thomas, of course, knew nothing of these conversations between Zakin and Kaltsas. While there is no direct testimony that Zakin ever reported the conversations to Lesser (indeed Zakin denies that the conversations ever occurred), the Court finds that the conversations actually did take place and that it is inconceivable that Zakin did not report them to Lesser.

We now turn to the April, 1968 meeting among Lesser, Thomas and Donald Edwards. Edwards, of course, had an interest in the transaction because the obligation of Edco to Duralite was interwoven in the negotiations over Thomas' Duralite stock, and at this point, Thomas' Randolph stock.

Lesser conveyed to Thomas, by what he said and by the way he said it, a feeling of "imminent disaster." Lesser represented the condition of Duralite as still being a "loss situation." While Thomas testified that Lesser did not actually use the word "bankruptcy," there is no question that Lesser conveyed to Thomas, and meant to convey to Thomas, the impression that Lesser's own stock in Duralite was worthless and that he was remaining with the company only for his salary and in the hope that someone might want to buy the company. Indeed, his manner was so downcast that Thomas rejoined "it looks like we're getting near bankruptcy." (Tr. 281)[3]

3. Q. —You have said, in words of substance, to us here that you got, based on your conversation with Mr. Lesser, the impression that he was pessimistic as to the fortunes of the company in that fiscal year.

While the testimony of Thomas is, in part, disputed by Lesser, the Court finds that Thomas' account is accurate and totally persuasive. The Court finds that Thomas and Edwards, concerned about the imminency of bankruptcy and the calling of Thomas' and Edco's obligation to Duralite, came to an immediate meeting of the minds with Lesser. Thomas, abandoning all of his previous demands, agreed to exchange his Duralite stock for nothing more than the release of his and Edco's obligations (reckoned to be $38,000.00) and accepted Lesser's January valuation of his interest in Randolph of $71,800.00, *based on the discounts for possible distress sale and foreclosure of mortgages on the Randolph property.*

In spite of Lesser's denials of talk of bankruptcy, it is obvious that if there had been no such thought or talk Thomas would not have agreed, in April of 1968, to sell his stock in both Duralite and Randolph for $109,000.00, a figure less than the $112,500.00 he had contracted to receive for his Duralite stock alone just four months before (December 19, 1967 contract, P–10).

A few days after the April meeting, on April 15, 1968, Thomas' counsel forwarded a draft of the new agreement (P–16, P–17) to Lesser's attorneys. The formal agreement itself was dated June 18, 1968 (P–18).[4]

The agreement, in addition to providing for the sale of Thomas' interest in Duralite and Randolph to Randolph, also adjusted the claims among Duralite, Edco and Temco.

The contract states:

WHEREAS, all the parties recognize that the sale and purchase of the stock in Purchaser and Duralite and the payment of moneys by Edco to Duralite and purchase of said inventory of Duralite by Edco and Temco are *interrelated* because of the relationships between the parties, and the parties therefore desire to agree upon all of said matters for their ultimate resolution, and . . . .

(P–18, emphasis added)

The contract provided that Randolph was to have 90 days to arrange for the financing of the purchase. The contract itself was closed on November 21, 1968 (P–25).[5]

Within two weeks, Lesser and Zakin, after less than four hours of negotiation,

A. Yes, sir.

Q. In substance, what was it that Mr. Lesser said or didn't say or what was it about his manner, conduct or any other means that gave you that impression of his state of mind concerning the company?

A. Well, his manner seemed subdued, downcast and in the exchange that followed it seems to have been borne out—if I may continue?

\* \* \* \* \*

A. Well, either Mr. Edwards or myself —I don't recall which—asked Bert, "If things are that bad and the business is in danger of collapse, why are you sticking around, why are you sticking around for?"

Mr. Lesser said, "Well, I've still got my salary and besides which it might be worth something to somebody."

And we asked him, "You mean that somebody might be willing to buy it?"

And he said, "Yes."

And in substance the feeling that we got was one of desperation.

MR. COLE: I object to "the feeling that we got."

THE COURT: Strike the word "we."

Q. Confine yourself to whatever impression you got.

\* \* \* \* \*

A. I got the impression of imminent disaster.

(Tr. pp. 275–277)

4. The contract of sale, by its terms, was between Randolph Avenue Corporation as Purchaser, Duralite, Morton I. Thomas, identified as the "Seller," "Edco" and Temco.

5. In point of fact, Duralite showed a net profit of $111,958.00 for fiscal year 1968 (P–40).
The June 18, 1968 agreement to purchase Thomas' stock, after the setoff of what Thomas and Edco owed to Duralite, required $71,666.60 in cash. This was arranged by Randolph's securing a loan in that exact amount from William Iselin & Co., Inc., and using the funds to purchase both the Duralite and Randolph stock from Thomas (DD–26). The two companies thereafter merged.

agreed to sell all of their interest in Randolph and Duralite to Giffen for 33,334 shares of Giffen Industries.

Between these two events, that is, the purchase of Thomas' stock and the agreement with Giffen, five days after Thomas signed the contract for the sale of his Randolph and Duralite stock, Lesser conveyed 23,100 shares of Duralite stock and 2 shares of Randolph Avenue stock to Irving Zakin. In return, Zakin executed a $5,000.00 demand promissory note, without interest, in favor of Lesser. To this date, or at least as of June 1974, Zakin has never paid any of that $5,000.00 to Lesser. By this transaction, the purchase of Thomas' stock and the conveyance of the Lesser stock, Lesser achieved a 2/3 ownership in both Randolph and Duralite, and Zakin, who owned 10% of each company before, increased his holdings to a 1/3 interest in each company.

Zakin testified at trial that he had been promised a 20%–25% interest in Duralite in 1958 when he first joined with Lesser and Thomas. The thrust of his testimony, of course, is that the agreement of June 23, 1968 was nothing more than the fulfillment of this ancient obligation. While it is true that Zakin was promised stock in Duralite when he joined that firm, the Court finds that he was not promised 25% of both companies. He received, as noted, a 10% interest in both companies conveyed to him by Lesser and Thomas in fulfillment of their obligation, when Thomas

withdrew from Duralite in 1965. The Court finds that in 1968 there was another reason for his receipt of an additional 15% in each company for what the Court finds to be a note which neither Lesser nor Zakin expected to fall due. As Lesser's letter of June 23, 1968 states:

> Dear Irving:
>
> This will confirm our agreement which was reached *just prior* to the execution by Mort Thomas and his affiliated companies of his agreement to sell to Duralite and Randolph Avenue the stock which he holds in those companies.
>
> I had previously indicated to you that I would sell you sufficient stock so that, *in the event* Mort Thomas were to sell his stock in the companies back to the companies, you would own one-third of the stock of the corporation. This was to cover both Duralite and Randolph Avenue . . . .

(emphasis added)

It is obvious that the conveyance of additional stock to Zakin was not in fulfillment of any 10-year old promise to him, but was conditioned on the extinction of Thomas' interest in Randolph and Duralite, and, the Court finds, was intended to put Zakin in a position to enjoy a greater participation in the event of a takeover by Giffen Industries. Moreover, this Zakin-Lesser transaction was itself concealed from Thomas.[6]

---

Moreover, apparently neither the Resnicks nor Iselin voiced any objection to the deal, although the Resnicks had refused to waive their options on Thomas' stock pursuant to the December 4, 1967 agreement and no financing could apparently then be arranged. The June 18, 1968 agreement, however, encountered no such hardships. Lesser, as noted, procured the entire purchase price of more than $71,000.00 for Thomas' stock by obtaining a further loan in that amount from Iselin, although to do so he had to pledge *all* of the Randolph assets to guarantee *all* of the money owed by Duralite to Iselin, then more than $300,000.00, to get the $71,000.00 in cash. (D–78) This was obviously not advantageous to Randolph and

would not have been advantageous even to Lesser, except for his knowledge of the imminency of the Giffen transaction.

6. Zakin's deposition testimony, commencing at page 52, is illuminating:

Q. What did he say?
    *      *      *      *      *
A. He said to me if and when Thomas would be bought out then in that event I would receive more shares.
    *      *      *      *      *
Q. Your first discussions with Mr. Lesser regarding increasing your stock ownership, when did those discussions take place?
A. Some time prior to this writing.

Within a matter of days after the June 18th contract for the sale of Thomas' stock, and the June 23rd conveyance of additional stock to Zakin, Zakin and Kaltsas met at a furniture show held in Chicago in July.

Zakin approached Kaltsas and the two men discussed the possible takeover of Duralite by Giffen. Kaltsas indicated that he was confident that Giffen would want Duralite, that he expected his own merger to be finalized shortly, and that thereafter Giffen would take over Duralite. Zakin, for his part, told Kaltsas that a partner in Duralite had been bought out, that Zakin's percentage in the company was now higher than it had been, and that now the Duralite people were "free" to work on negotiations and were ready to make a deal.

Following this conversation both men proceeded to a telephone booth and, according to Kaltsas, telephoned Lesser in New Jersey. Zakin told Lesser he was working on the merger.

As indicated, the Prest-Wheel—Giffen deal closed in September. On November 21, 1968, Thomas and Lesser, et al., closed on the contract of June 18, 1968.

Two weeks later, on December 5, 1968, Kaltsas brought Monroe Cooperman of Giffen Industries to New York. They picked up Irving Zakin and went together to New Jersey for a meeting with Bertram Lesser. After less than two hours of negotiation, on December 5, 1968 Lesser and Cooperman shook hands on a deal whereby all of the Duralite stock held by Lesser and Zakin would be conveyed to Giffen Industries in return for 16,667 shares of Giffen stock. Cooperman asked to meet with Lesser on the next day, December 6th. He had thought the matter over and decided that Giffen would have to acquire not only Duralite, but also the property and plant and warehouses which Duralite "leased" from Randolph. On December 6th, over luncheon, Lesser and Cooperman shook hands on a deal whereby Lesser and Zakin would convey all of their stock in Randolph to Giffen in return for an additional 16,667 shares of Giffen Industries. As of December 6, 1968, Giffen Industries was selling for approximately $60.00 a share on the over-the-counter market.

Lesser and Zakin would have the Court believe that they did not have any monetary figure in mind when they agreed to sell their interests in Randolph and Duralite. In a transparent attempt to frustrate Thomas, on the question of damages if not on liability, they attempted to suggest at trial that all they bargained for with Cooperman was shares of Giffen, and that they neither spoke nor thought of a dollar valuation of their holdings in Duralite and Randolph. The Court, however, finds otherwise. When Lesser spoke with Cooperman it was his intention to receive $1,000,000.00 in value for the Duralite stock and $1,000,000.00 in value for the Randolph stock, as Lesser was forced to concede in his testimony. (Tr. 2148–2149)[7] Moreover, at the time of the bargain Lesser did not know that he was to receive lettered stock. (Tr. 2191) When Lesser and Cooperman struck their bargain in early December of 1968, Lesser thought, rightly or wrongly, that he and Zakin were receiving $2,000,000.00 in value for their stock.[8] That, of

Q. How long prior?
A. I don't recall specifically, but it wasn't too long prior.
Q. Was it during 1968?
A. Yes.
Q. And this was in May or June of 1968 was when Mr. Lesser indicated he would—
A. Correct.
Q. —sell you additional stock?
A. Correct.

Q. Did you disclose to Mr. Thomas the fact that you had agreed to acquire the number of shares specified in P–12?
A. No.

7. See also, Lesser Deposition, pp. 48–49.

8. Thomas would have the Court find that the sale was in fact made for $2,000,000.00. This is not the fact, however, as will be detailed subsequently.

course, was within the prediction made by Kaltsas to Zakin several months before.

The defendants vigorously attacked the credibility of Kaltsas. By means of rigorous cross questioning and by calling former Giffen personnel, they sought to discredit Kaltsas' testimony by demonstrating that he had a motive to lie in an attempt to injure Giffen (which now owns Duralite), Lesser and Zakin, who ultimately displaced him in the Giffen constellation of companies. It is the defendants' theory that Kaltsas is resentful because his stock in Prest-Wheel, has decreased in value from $60.00 per share when he received it to its present value of less than $1.00 per share. Additionally, Kaltsas was fired by Giffen in early 1970 under bitter circumstances which have led him to sue Giffen and Giffen to sue him in Massachusetts. These lawsuits were still pending at the time of his testimony before this Court. When Kaltsas was fired by Giffen, Lesser and Zakin were placed in charge of Prest-Wheel. Thus, the defendants have much force to their argument that Kaltsas has reason to wish the defendants harm.

On the other hand, Kaltsas testified that as one of the largest shareholders in Giffen it would be "childish" for him to attempt to hurt Duralite, and thereby Giffen, and that he refused to testify until he was subpoenaed by Thomas' attorney. The fair import of his testimony was that a verdict against Duralite would be to his pecuniary loss.[9]

In any event, the Court has assumed that Kaltsas does have reason to be vindictive, and the Court closely scrutinized his testimony as he gave it, and in review. Equally important, the Court closely scrutinized the testimony of Zakin, Lesser and Cooperman. The result is that the Court is persuaded that the Kaltsas account is closest to the truth, and that the testimony of Lesser and Zakin in this area is simply not credible.

It was Zakin's testimony that prior to December 5, 1968, he and Kaltsas never discussed any merger between Prest-Wheel and Duralite, or Duralite and Giffen. Indeed, it was his testimony that prior to October he and Kaltsas did not meet or have discussions at all that year. (Tr. 2729, 2731)[10] Lesser likewise denied any information concerning possible merger prior to the day (December

9. Throughout the course of trial Duralite has argued that, whatever the liabilities of Lesser and Thomas, it would be unfair to Giffen and its shareholders, who are blameless, to hold Duralite itself jointly and severally liable. Kaltsas and his family, as noted, own tens of thousands of Giffen shares. Having studied the evidence submitted concerning the affairs of Giffen, it is clear to the Court that a substantial verdict against Duralite would be inimical to Kaltsas' pecuniary interest.

10. In his denial of these meetings, Zakin attempted to demonstrate that he could not have met with Kaltsas at a Duralite booth in a show held in the New York Coliseum, as Kaltsas testified he did. Zakin testified that there were no furniture shows of any kind between January and June (Tr. 2751), that there is no "show relating to either outdoor casual furniture industry * * * or to the general furniture industry in April in New York," and that outside of the hardware show, Duralite never took a booth in any show, "no matter the appellation or name you give it," but always

showed in its own New York showroom. (Tr. 2735)
This testimony, if truthful and accurate, would have substantially undermined Kaltsas' credibility and the probative weight of his testimony by demonstrating that a critical meeting and conversation claimed by Kaltsas did not in fact occur.
Zakin's testimony was not accurate. His own documents established that there was such a "summer and casual furniture exhibit" in the New York Coliseum from April 22 to April 25, 1968, and that Duralite did take a booth. (D-83, Tr. 2770) When confronted with the exhibit, Zakin professed no recollection of the show (Tr. 2771), but admitted that if Duralite did take a booth he, Zakin, "most certainly would probably have spent at least part of the day there." (Tr. 2773) However, in spite of this admission, Ronald Saloman, Duralite's Credit Manager, was called to the stand. He testified, in May of 1974, that Duralite took a booth in the New York Coliseum for five days in April of 1968 and that he had a specific recollection, six years later, that Zakin did not attend that show at any time during those five days.

5, 1968) that Cooperman and Kaltsas walked into his office. It was the testimony of both men that they were completely surprised by that visit, and the interest of Giffen, and that they knew nothing of the Giffen company or the value of its stock before the two-hour negotiating session in which they agreed to sell their stock in Duralite for 16,667 shares of Giffen.

The implausability of this testimony was underscored by the unpersuasive manner in which it was delivered. But if the Court had entertained any doubt about the veracity of this testimony, the testimony of Monroe Cooperman would have laid it to rest.

Cooperman was called by Duralite. Although he had no apparent present tie to Giffen or Duralite, or to any of the parties, his partiality to the defense was apparent to the Court. Cooperman, although vague about the reasons and circumstances which led to his visit to Lesser and Zakin, did have sufficient recollection to remember that it was Kaltsas who brought the possibility of the Giffen acquisition to his attention about November of 1968, and that in November, Kaltsas told him that Duralite was "turning the corner," that it was making rather than losing money. (Tr. 2924–2926) Kaltsas was also able to relate to Cooperman that Duralite's volume was between 6 and 7 million dollars, that Lesser and Zakin were the only shareholders (Tr. 2966), and that Lesser owned more than 50% of the stock, and Zakin the rest. (Tr. 2932–2933) It is not unlikely that Kaltsas gave Cooperman more information than Cooperman was able to recall at the time of trial, but the mere fact that Kaltsas was able to describe the financial turnaround of Duralite to Cooperman is corroborative of his version of the events prior to the visit Cooperman and Kaltsas made to Lesser and Zakin.

It is now appropriate to turn to Thomas' allegations. We have already disposed of his first claim: there is a total lack of evidence that any of the defendants wrongfully denied Thomas access to documents which he asked to see. This, however, obviously does not end the matter.

The simple fact is that Thomas was induced by Lesser in January of 1968 to believe that his stock in Duralite was worthless, and worse still, that Thomas' position in Duralite had been transformed into a holding which, by reason of his personal loan and his company's (Edco) indebtedness, could be momentarily translated into a liability. This information, the evidence indicates, was accurate and truthful when Lesser gave it in January of 1968. It certainly was no longer accurate when Lesser, Thomas and Edwards met in April, and as of June 18, 1968, when the contract of sale was made, it was totally false. Yet Thomas sold his stock on the basis of the representation that Duralite still hovered on the edge of bankruptcy, and Lesser stood by silently and let him do so. (Tr. 2345–2351) Lesser's motives in so doing are apparent. Had he revealed to Thomas in April, or at any time prior to June 18th, that Duralite's profit picture had turned, Thomas would have returned to his original demands, the negotiations would have begun again, and Lesser would have been forced either to delay the Giffen negotiations or to include Thomas in them.

Rule 10(b)–5 provides, in relevant part:

It shall be unlawful for any person . . .

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or *to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,* or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit

upon any person, in connection with the purchase or sale of any security. (17 C.F.R. 240.10(b)–5; emphasis added)

■ The cases construing the requirement of disclosure in 10(b)–5, defining a *material* non-disclosure, and determining whether, in a non-disclosure case, the party seeking damages must show reliance are legion. Recently, the Supreme Court in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) and the Third Circuit in Rochez Bros. Inc. v. Rhoades, 491 F.2d 402 (3rd Cir. 1974) and Harnett v. Ryan Homes, Inc., 496 F.2d 832 (3rd Cir. 1974), have provided trial courts with clear tests to employ in such cases. The test to be applied here, simply put, is whether Duralite's turnaround from loss to profitability between January and June of 1968, and the change in its outlook from imminent bankruptcy to renewed health, and the assurances by a leading competitor that a profitable takeover of Duralite was not only feasible, but that he would see to it that it was done, was information to which Thomas would "attach importance" in determining the value of his stock and whether or not to sell it.

It is obvious that Thomas would have attached a great deal of importance to all of this information. Indeed, this information, or the lack of it, was of critical importance to Thomas in the situation in which he found himself.

The critical date here, the parties agree, is June 18, 1968, the date the contract of sale was signed. Radiation Dynamics v. Goldmuntz, 464 F.2d 876 (2nd Cir. 1972). Had Lesser on or before that date revealed to Thomas all or any part of the above information, all of which Lesser knew, Thomas would not have signed that contract at that price.

But this is more than just a case of the non-disclosure of important and material information by one party. This is a case of Lesser's affirmative misrepresentation of critical fact with intent to deceive Thomas. In January, Lesser created the fear of bankruptcy in Thomas' mind. When he spoke in January, Lesser spoke correctly. But when he spoke again, in April, conditions were different. By June 18th they had changed even more. When Lesser spoke of a "loss situation" in April, and the worthlessness of Duralite stock, he spoke falsely, and with intent to deceive Thomas by wielding Thomas' misplaced fear of bankruptcy as a weapon to aid Lesser in obtaining Thomas' stock. Lesser's silence thereafter, between April and June 18th, was, in the context of this case, an affirmation that nothing had changed. In June Thomas sold, *at Lesser's price*, solely because of what Lesser had told him in April. At the very least, even if we assume that when Lesser spoke erroneously in April, he spoke in innocent error, he surely knew the correct facts by June. In such circumstances, Lesser could not remain silent and enrich himself and Zakin at Thomas' expense, by capitalizing in June on what he then knew to be misinformation upon which Thomas was relying.

■■ The defendants have taken the position that irrespective of whether Lesser withheld material information from Thomas, Thomas cannot recover because he failed to exercise due care in not ascertaining the financial condition of Duralite for himself prior to June 18th. This defense is without merit. While it is true that "before an insider may claim reliance on a material misrepresentation or non-disclosure, he must fulfill a duty of due care in seeking to ascertain for himself the facts relevant to a transaction," Rochez Bros., Inc. v. Rhoades, *supra*, 491 F.2d at 409, Thomas was hardly the type of "insider" who had access to information which could have alerted him to Lesser's deceit. By January of 1968 Thomas had been totally divorced from Duralite's management for 3 years. He had no access to the monthly status reports, and indeed no right to them. In January, when Lesser spoke of the $409,000.00 loss, Thomas informed Lesser that he would have it

verified. Thereafter, Thomas had his accountant check into the reported loss, and the accountant Lieberman reported that he had verified it.

Once that loss was verified, Thomas believed Lesser. Thereafter, Thomas took the reasonably prudent course. In April, when he learned the situation was no better, he got out as quickly as he could. Without access to the monthly status reports which Duralite refused him, and without daily access to Duralite's plant and accounts, he could not be required to wait until Duralite either went bankrupt or issued another annual report in October.

As far as the prospects of the Giffen acquisition were concerned, Thomas had no way to know the true state of affairs. Lesser's offhand comment that he was holding on to his Duralite shares only because he still had his salary, and maybe "someone" might want to buy the company, was not calculated to alert Thomas. It was intended to put him to sleep. Lesser was merely offering an explanation of why, in the face of disaster, he was attempting to carry on. In the context of the conversation, Lesser's reference to the fact that Duralite might be worth "something" to "somebody" conveyed the flavor of a garage sale, not that of an important merger.

The defendants also contend that the non-disclosure of the Kaltsas-Zakin conversations would not be actionable under 10(b)–5. Thus, Zakin and Lesser say:

> Even if the Kaltsas testimony concerning discussions with Zakin is believed, it is clear from the cases discussing the issue that these alleged embryonic discussions could not be accorded the dignity of a material fact. The reported cases are uniform in the conclusion that before such discussions become material, they must reach an advanced stage, a stage beyond the point of initial contact.

(Def. Post-Trial Brief, p. 31)

The Court has well in mind the incisive admonition of Judge Adams, in Harnett v. Ryan Homes, Inc., *supra*, 496 F.2d at page 838:

> In the corporate world, as elsewhere, the initial ruminations of executives must complete a circuitous course before becoming, if ever, actuality. Further, if we were to require corporate officers to disclose inchoate ideas, musings as it were, on matters that relate to the value of their companies' stock, few stock transactions in which they participate would avoid the possible charge of a Rule 10b–5 violation. If, on the other hand, the district court had found that the undisclosed facts were something more than Edward Ryan's thoughts and that they would likely have an identifiable impact on the fact of any proposal for employee participation in the public offering, a conclusion that the undisclosed facts were material might well have been warranted.

See also, List v. Fashion Park, Inc., 340 F.2d 457 (3rd Cir.), cert. denied 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

It is clear that the law does not require that private dreams, musings, aspirations and other remote hopes of the buyer of stock be disclosed to the seller. But that is not this case. The hopes of the future Giffen acquisition were imminent enough for Lesser and Zakin that, after three and one-half years of negotiating with Thomas, they felt the need to bring the negotiations to a speedy end. The Kaltsas conversations not only *would have been* of importance to *Thomas*, they *were* in fact of sufficient importance to *Lesser and Zakin* to inspire Lesser thereafter to deceive Thomas with regard to Duralite's true financial condition. If the discussions between Zakin and Kaltsas in January and April did not go too far, it was because Zakin was not ready to go too far until Thomas was out. Thus, in July, after Thomas had signed the contract, Zakin told Kaltsas that a partner was gone, Zakin's share had been increased, and the deal could now go ahead. Rumi-

nations by executives are one thing; this kind of chicanery is quite another.

It is very clear that if Thomas, who for close to 3 years had tenaciously held on to his stock, had known of these conversations, he would not have sold his stock in June, but would have joined the negotiations or, at the very least, would have waited to see the developments.

■ Thomas, in a separate count of his complaint, sues under the common law of New Jersey for fraud and deceit. Jurisdiction of this count alleging breach of duty under the laws of the State of New Jersey is based on the principles of pendent jurisdiction. This count, alleging common law fraud, must be considered in the light of New Jersey law. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■■ The term "fraud" is used in New Jersey to designate what is really an action for deceit. Anderson v. Modica, 4 N.J. 383, 389, 73 A.2d 49 (1950). There are five necessary elements to maintain an action for deceit in New Jersey:

(1) a representation by defendant to the plaintiff with intent that the latter party rely upon it;

(2) knowledge on the part of defendant that the representation is in fact false;

(3) belief by the plaintiff that the representation is true;

(4) reliance on such representation; and

(5) the taking of action and consequent injury.

Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J.Super. 369, 379–380, 164 A.2d 607, 612 (App.Div.1960), and cases cited therein.

■ The Third Circuit, faced with a similar case of alleged violations of federal and state law on the grounds of alleged fraud, found that New Jersey law required the defendants to establish by clear and convincing evidence that the transaction was honest, fair and reasonable. Pappas v. Moss, 393 F.2d 865,

868 (3rd Cir. 1968). The Court remanded the issue to the district court, which had failed to make its determination on the above legal issue. 393 F.2d at 868. On remand, the district court held that the defendants did not sustain their burden of proving that the entire transaction was honest, fair and reasonable. Pappas v. Moss, 303 F.Supp. 1257, 1276 (D.N.J.1969). In *Pappas*, the court found that the insiders of the corporation knew that the financial situation had turned around, but did not release the information to the public promptly so that the stock market could react to it, and held that the failure to reveal the turnaround situation prior to entry into the transaction was not honest and not reasonable. *Id.*, 303 F.Supp. 1277.

The comparison to the case *sub judice* is most illuminating. The failure of defendants to give Thomas current financial information which would have indicated that Duralite was in a turnaround situation cannot under New Jersey law be considered honest or reasonable. Defendants failed to disabuse Thomas of the idea that the loss of $409,000.00 for the fiscal year July 31, 1967 was continuing, when in fact, by June 18, 1968, Duralite's fortunes had "turned around." (See D–69) Thomas, having no reliable way of checking the financial data of a closely-held corporation, and not having been informed of the turnaround in the profit picture, sold his stock in Duralite and Randolph for less than its true value. In addition, the failure to disclose the talks with Kaltsas is sufficient to constitute fraud under New Jersey law.

Before turning to the question of damages, it is necessary to detail the course of dealing between Lesser and Zakin, on the one hand, and Giffen on the other.

As noted, by December 6, 1968, within weeks after closing the deal with Thomas by which they purchased his Duralite and Randolph stock for a total consideration of $109,892.81, Zakin and Lesser reached a meeting of the minds with

Giffen for the sale of both companies for 33,334 Giffen shares. As part of these meetings, which lasted less than four hours and which the defendants maintain were their first knowledge of Giffen's interest, it was also agreed that Lesser and Zakin could earn an additional 16,667 shares of Giffen depending on the future earnings of Duralite. A formula was agreed upon, apparently instantly, whereby Lesser and Zakin would begin to earn these shares in each year in which Duralite earned a net profit of $200,000.00. (Lesser Dep., pp. 50–57, 61)

Before detailing the ensuing events, we must turn to the Resnicks options on Lesser's stock, the stock which he planned to sell to Giffen.

It will be recalled that these options had been granted to the Resnicks as security to induce them to guarantee the Iselin loan to Duralite. These options held no investment interest for the Resnicks. At all times all of the parties understood that these options had been taken by the Resnicks only to defend their obligation as guarantors of Duralite's indebtedness to Iselin. The options, in the event it became necessary, would enable the Resnicks to take a position in the Duralite management. As all parties understood, indeed as Peter Messina, the representative of the Resnicks, had made clear, the Resnicks had "for some time" wanted to discharge their obligation to Iselin and would have been delighted to surrender the options and relieve themselves of their obligation at any time. (Tr. 2173; Deposition of Lesser, p. 62)

Thus, on December 28, 1968, within days after meeting with Cooperman, Lesser obtained the release of these options so the sale to Giffen could go through. That contract (P–27) provided in part:

> The Resnicks hold options to purchase stock in Duralite and Randolph, which options were created by an agreement of January 28, 1965, and, at that time, involved stock owned by Lesser and Morton I. Thomas. Said option agreements have been modified from time to time and Morton I. Thomas is no longer involved in same, since his stock has been purchased by Randolph.

> The granting of said options was in consideration of the guaranty by Resnicks of indebtedness of Duralite to William Iselin & Co., Inc. . . .

> The duration of the option on stock of Lesser and, previously, of Morton I. Thomas, was for five years from January 28, 1965 or until repayment in full of the debt to William Iselin & Co., Inc., whichever was longer. Resnicks are still responsible on the guaranty to William Iselin & Co., Inc.

> . . .

> Lesser has obtained the opportunity to effect the sale of 100% of the stock of Duralite and Randolph to another business entity. The sale cannot be made unless Lesser together with Irving H. Zakin (Vice president and Sales Manager of Duralite and Randolph) own 100% of the stock being sold. . . . Thus it is necessary for Lesser to obtain the release of the aforementioned options in order to be able to effect the said sale. Said sale will be to the distinct advantage of the Resnicks since it will create an entity which will, through its existence as the corporate parent of Duralite, obtain a release for the Resnicks of their obligations on their guarantees to William Iselin & Co., Inc. and V.A. W. of America, Inc.

> \* \* \* \* \* \*

> II. 1. In order to induce Lesser to enter into the aforementioned negotiations and, in connection therewith, or independently thereof, to obtain for the Resnicks and their corporate affiliates releases from their liability on the aforementioned guarantees, the Resnicks agree that their options to purchase stock of Duralite and Randolph shall cease and terminate and become null and void upon the delivery to them of releases of their afore-

mentioned liability to William Iselin & Co., Inc. and the liability of their corporate affiliate to V.A.W. of America, Inc.

\* \* \* \* \* \*

Iselin, of course, was no problem. Under the terms of the sale, Duralite would belong to Giffen, its obligations would be Giffen's, and Iselin would be more secure than before.

At this point it is appropriate to note that throughout the litigation the defendants have urged that, if the Court finds them liable, Thomas' damages are to be computed by recognizing the Resnicks' option on 'one-half of all of his Duralite and Randolph stock. Thus, for example, they claim that Thomas, if damaged, was not out of pocket on the full 45½ percent of his holding in Duralite, but only on 22¾ percent, because of the options on the remaining stock. This position is simply not tenable. The Resnick options were never exercised. Thomas, when he sold his stock, sold all of it, the Resnicks having waived their rights. Having sold *all* of his stock in Duralite and Randolph, his damages, if any, must be computed on the basis of all his stock. Moreover, had he held and not sold, had he participated with Lesser and Zakin in the Giffen takeover, it is indisputable that the Resnicks would have waived their options on his stock, as well as Lesser's, in order to discharge the guarantee of their obligation on behalf of Duralite.

Lesser and Zakin, having obtained the waiver of the remaining Resnick options by December 28, 1968, were preparing to close with Giffen. A letter agreement was signed, dated January 8, 1969 (P–29). That agreement provided in part:

1. Giffen will acquire all of the issued and outstanding shares of Duralite and the Building in exchange for 33,334 shares of Giffen Common Stock to be delivered on the closing. A maximum of 25,000 additional shares may become issuable to you depending upon the future earnings of Duralite

as more fully set forth in paragraph 2 below.

\* \* \* \* \* \*

4. Duralite shall enter into an Employment Agreement with each of Bertram R. Lesser and Irving H. Zakin for a period of five years at a salary of $40,000 per year, upon such further terms and conditions as you and Giffen shall agree.

5. . . .

d. Giffen will, at the closing, guarantee the obligations of Duralite to William Iselin & Co., Inc. and V.A.W. of America, Inc. provided that such guarantee will result in the termination of the stock options presently held by Harry and Louis Resnick on the stock of Duralite and Randolph Avenue Corporation.

\* \* \* \* \* \*

7. It shall be a condition of our agreement that the total amount owed by Randolph Avenue Corporation in respect of the first and second mortgages on the Building does not exceed $278,775, and except for these mortgages and a third mortgage presently held as security for loans to Duralite by William Iselin & Co., Inc., there are no other liens or encumbrances of any sort on the Building. It shall be a further condition of our agreement that you shall obtain and deliver to Giffen documents prepared by independent appraisers acceptable to Giffen to the effect that the present fair market value of the Building is in excess of $1,250,000.

\* \* \* \* \* \*

9. Giffen will file Registration Statements under the Securities Act of 1933, as amended, in each of 1969, 1970 and 1971 and will include in each such Registration Statement one-third of the shares received by you on the closing date of the Plan. Any shares received by you based on increased future earnings of Duralite shall be registered in full in the calendar year fol-

lowing the year such shares are earned.

\* \* \* \* \* \*

In the hiatus between the letter of January 8th and the close of the contract on March 31, 1969 (DD–18), all did not go well. The value of the Giffen stock began to recede in the marketplace, and, as it did, Lesser's intention to sell Duralite and Randolph for $2,000,000.00 "worth" of Giffen stock was frustrated. As Giffen fell, in February and March, Lesser upped the number of shares he wanted for Duralite and Randolph to 50,000 (P–31) in order to realize his aim (Lesser Dep., p. 9). Finally, Lesser and Zakin agreed to accept 45,000 shares of Giffen:

Q. But in the course of your negotiations with Giffen, did you refer to any market value?

A. We did not refer to any, but we, Mr. Zakin and myself, had it well in mind as the negotiations proceeded.

Q. All right. So as the negotiations proceeded, and having originally contemplated 33,000 shares at a time when the market was about sixty, subsequently, in the course of the negotiations, you were able to negotiate a larger number of shares of Giffen?

A. That is correct.

Q. What was the course of those negotiations? Do you recall what you said to Giffen?

A. Simply that the market price of the stock had dropped from the time we had started our negotiations, and we felt we were entitled to additional shares.

Q. Representing what, a higher purchase price, or the same purchase price, put it that way?

A. As I recall it, the 45,000 at the time we made the agreement did not come to the same total number of dollars as the original negotiation considered at $60 per share.

(Lesser Dep., p. 12, lines 1 through 20)

The contract of sale was signed on February 28, 1969 (DD–18). It provided that Lesser and Zakin were to receive 45,000 shares of Giffen (30,000 for Lesser, 15,000 for Zakin) and that Giffen would use its best efforts to register these shares by December 31, 1969, although Lesser and Zakin were prohibited from selling more than one-third in 1969, and more than one-third of their holdings in each of the following two years, 1970 and 1971. Giffen at that time was selling at about $40.00 per share (P–59).

Giffen could not fulfill its contractual promise. The Giffen stock, which had reached its high of $60.00 in late 1968, and which was at $40.00 by the end of February of 1969, crumbled to a low of $12.75 by the end of 1969 (D–73). Giffen, because of adverse financial circumstances, not the least of which was the failure of its Prest-Wheel subsidiary, could not convey the 45,000 shares of registered stock to Lesser and Zakin as promised in the February 28, 1969 contract.

Lesser and Zakin sought to rescind the agreement. They wanted either the registered Giffen stock or the return of Duralite and Randolph. Giffen could do neither. Because of the unexpected losses of the Prest-Wheel division, and the profitability of Duralite in the intervening months, Giffen was anxious to avoid a complete rescission of the agreement and a return of Duralite to Lesser and Zakin; on the other hand, because Giffen could not register its stock, it could not fulfill the terms of the acquisition.

On April 17, 1970, after negotiation, the Board of Directors of Duralite authorized a partial rescission of the original agreement. The minutes of the meeting (D–72) reflect the following pertinent information:

A Meeting of the Board of Directors of DURALITE COMPANY, INC. was held at 3235 N.W. 62nd Street, Miami, Florida, on Friday, April 17, 1970, at 2:00 P. M. Local Time.

\* \* \* \* \* \*

Mr. Timoner acted as Chairman of the meeting . . .

The Chairman stated to the meeting that a proposed settlement of the dispute between Giffen Industries, Inc. and Messrs. Bertram R. Lesser and Irving Zakin arising out of the performance by Giffen of the terms and conditions of the Agreement and Plan of Reorganization dated as of February 28, 1969 had been reached.

. . .

\* \* \* \* \* \*

(a) The premises located at Barbour Avenue in Passaic, New Jersey (the "Barbour Property") presently owned and occupied by this Corporation, shall be transferred to Messrs. Lesser and Zakin or to such other corporate or other entity as they shall direct.

(b) This Corporation shall lease back the Barbour Property for an initial term of fifteen (15) years with an option to renew for an additional fifteen (15) years at a rental of $160,000 a year for the first five years, $175,000 a year for the second five years, $190,000 a year for the third five (5) years and $190,000 a year for each year of the renewal term;

(c) The performance by this Corporation under such lease shall be guaranteed by Giffen;

\* \* \* \* \* \*

(e) The Plan shall be amended so as to provide for the delivery by Giffen to Messrs. Lesser and Zakin of either

(i) 54,000 shares of Giffen common stock, at Giffen's option, should such shares to be subject of an effective registration statement or should otherwise be free for transfer without registration on or prior to October 31, 1970, to and from Messrs. Lesser and Zakin, and should the average price of Giffen's common stock for ten trading days prior to delivery of such shares be not less than $12.00 per share; or

(ii) If such conditions for delivery of shares are not met, $600,000 in cash and notes (approximately $458,000 in cash and $142,000 in notes) ; . . .

\* \* \* \* \* \*

FURTHER RESOLVED, that the President and any Vice-President of this Corporation be, and they each hereby are authorized and directed to execute amendments to the employment agreements, each dated March 31, 1969, between this Corporation and Messrs. Lesser and Zakin respectively, such amendments to provide for the duties of Messrs. Lesser and Zakin to include the chief responsibility for Giffen's aluminum lawn furniture operations and for the salary of each to be not less than $55,000 per annum. . . .

The resolution of the Board of Directors of April 1970 was followed by a formal contract between the parties dated July 24, 1970 (D–71).

As demonstrated, Lesser and Zakin received the Randolph property back. Under the terms of the contract they were to receive rental payments from Duralite of $150,000.00 each year for the first five years, $175,000.00 for each of the next five years, commencing August 1, 1975, and $190,000.00 for each of the next five years commencing August 1, 1980. It should be noted that this is a net lease. Duralite, the tenant, pays all of the real estate taxes, insurance, heat, electricity and maintenance; Lesser and Zakin receive the rent free of any obligation.

Giffen, because it could not convey 54,000 shares of registered Giffen stock one month later, by the end of October, also conveyed $600,000.00 in cash and notes to Lesser and Zakin.

By separate contracts dated July 24, 1970, Lesser and Zakin each received a raise from the $40,000.00 per annum agreed upon in March 1969, to $55,000.-00 per annum each *effective January 1, 1970* (DD–19, Tabs 4 and 5).

The defendants contend that the return of the Randolph property, the extremely favorable net lease, and the $600,000.00 in cash and notes are not all to be attributed merely to Giffen's failure to fulfill its contract of February 28, 1969 to convey the registered Giffen stock. They contend that these benefits were partially attributable to the fact that once Kaltsas left Giffen, Giffen needed their personal services to manage Prest-Wheel as well as Duralite. Although Zakin and Lesser do not attempt to delineate what portion of the rescission agreement is to be attributed to the increased worth of these services, their position is completely undermined by the rescission agreement itself.[11]

While their personal services may have been worth more to Giffen as of January 1, 1970, Giffen recognized this fact by a 40% raise in salary, awarded after less than a year of service, and the appreciation played no part in the return of the Randolph property, the favorable rent, or the $600,000.00 in cash and notes. These resulted from the fact that, as of mid-1970, Giffen simply could not afford to give up Duralite, and lacked the capacity to pay for it through a conveyance of Giffen stock.

We must now turn to the question of damages. As Judge Van Dusen wrote in Rochez Bros., Inc. v. Rhoades, *supra*, 491 F.2d at 411–412:

> In Affiliated Ute Citizens v. United States [*supra*, 406 U.S. at 155, 92 S. Ct. 1456 at 1473] the Supreme Court held that the correct measure of damages under § 28 of the Securities Exchange Act is the difference between the fair value of what the seller received for his stock and what he would have received had there been no fraudulent conduct, 'except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit.' The Court cited as authority for this latter measure of damages the decision in Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), where the First Circuit held:

> > 'On the other hand, if the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.'

The court in *Janigan* recognized that there are limits to this principle, but found that those limits were not reached where no extraordinary gains in the company's affairs attributable

---

11. The agreement makes it very clear that both men were to receive a $15,000.00 salary increase, nearly a 40% raise, precisely because of these considerations. Thus, in Lesser's case, the agreement provides (DD–19, Tab 4):

WHEREAS, the Corporation is desirous of obtaining the services of the employee in a broader capacity than heretofore . . . . .

　2. Effective January 1, 1970. . . . .

　4. As *full* compensation for his services hereunder the Corporation shall pay the employee an annual salary of not less than Fifty-five Thousand Dollars . . .

(emphasis added)

It is apparent that the agreement was to relate back to January 1, 1970, because that was when Kaltsas left Prest-Wheel and Lesser and Zakin took over.

to defendant's own special efforts subsequent to the purchase occurred.[18]

18. The court in *Janigan* pointed out that there was no evidence that defendant did anything different or worked any harder following the acquisition than he had before, that the company's improvement was attributable to factors independent of his personal efforts, and that he received a salary for the performance of what were his regular duties. Janigan v. Taylor, *supra*, 344 F.2d at 787.

This is the principle that must guide this Court in measuring the damages to be awarded to Thomas, as succinctly stated by Judge Van Dusen:

. . . the clear intent of the *Ute* rule of damages, read in its entirety and in light of *Janigan*, is to give a defrauded seller the benefit of whichever measure of damages provides the greater recovery: *either* the difference between the sale price of the stock in the fraudulent transaction and its fair market value at that time *or* the amount of the fraudulent buyer's profit on resale.

(*Rochez, supra*, 491 F.2d at 417; emphasis added)

Thomas, as noted, received $109,892.81 for his stock. Under the first test, we need to determine what the true value of Thomas' 45½% interest in Duralite and Randolph was as of June 18, 1968, when he contracted to sell it at that price.

Unfortunately, absent the Giffen transaction, there is no ready way to tell. Duralite was a closely-held corporation. There was no market in its stock, and no marketplace of offers and acceptances by which one could objectively find the measure of its worth. Randolph, it is true, was nothing more than a piece of real estate, capable of objective valuation. But the fortunes of Randolph and Duralite, its only tenant, were so inseparably mixed in 1968 that any valuation of Randolph as of 1968, standing alone, would be misleading and unjust.

■ The plaintiff argues, and properly so, that this dilemma is relieved because not long after June 1968, there was a negotiation for the sale of these companies. It is obvious that the best evidence of the true worth of Randolph and Duralite, in 1968, is what Lesser was willing to sell them for, and Giffen to pay for them, in an arm's-length transaction.

While this may be a valid yardstick of worth, it is not helpful in the instant controversy. On December 5 and 6, 1968, Lesser may well have had $2,000,000.00 in mind when he asked for 34,000 shares of Giffen for his companies, but Giffen was only offering lettered stock, and clearly did not contemplate the passage of $2,000,000.00 in currency, or, indeed, $2,000,000.00 in negotiable shares of Giffen.

This was the time of the conglomerate; a time characterized by Kaltsas, on the stand, and conceded by all parties herein, to have been "a time of evil." Conglomerates, like Giffen, were then making such acquisitions with lettered stock, worth really only a fraction of the stock then actually free to trade. When Eli Timoner, then Giffen's Chairman, told the *Wall Street Journal* that Giffen had purchased Duralite for $2,000,000.00 (P–60), he did not speak accurately, as he was forced to concede at trial. The simple fact is that the roughly 34,000 shares of Giffen lettered stock in December of 1968, when Giffen sold for $60.00, and the promise to register 45,000 shares of Giffen stock in February of 1969, when Giffen sold for $40.00, were not worth what the simple task of multiplication would imply.

The Court therefore rejects the plaintiff's claim that Giffen, in 1969, contracted to purchase Duralite and Randolph for $2,000,000.00, or anything approaching that figure.

■ The Court accepts instead the testimony of the defendants' expert, Mr. Greenebaum, who impressed the Court with his candor, his expertise and his professional approach to this problem. Greenebaum testified that, under a formula employed for lettered stock, and considering the restrictions on alienation

mandated by the February 28, 1969 agreement, the value of the consideration which Lesser and Zakin received for Duralite and Randolph pursuant to that agreement was $530,000.00. It would serve no purpose to repeat the formulations or considerations employed by Greenebaum. Suffice it to say that his testimony was never successfully contradicted and the Court finds it to be persuasive.

By this yardstick, the only yardstick available, the Court finds that Duralite and Randolph, in 1968, were worth approximately $530,000.00 in the marketplace and that the true value of Thomas' interest in 1968 was 45½% of that figure.

This, of course, does not end the inquiry; it merely supplies the result of the first test, the true value of Thomas' stock as opposed to what he got for it in the fraudulent transaction.

The second test is easier to apply. The Court has already found that when, in April of 1970, just fourteen months after the original contract of February 1969, the Giffen Board authorized the payment of $600,000.00, the return of the property and the highly favorable lease, it did so only because Duralite was peculiarly valuable to Giffen at that time, and not because of the personal services of Lesser and Zakin, who received other and separate benefits in recognition thereof.

It may well be that Duralite and Randolph were not worth as much as Giffen paid for them in 1970 to anyone other than Giffen. We shall never know. But that, too, is beyond our concern. The fact is that Giffen *did* pay that much to Lesser and Zakin for Duralite, that the amount paid is not remote from the original figure which Lesser and Zakin had in mind when they first met with Giffen, and that there is every reason to believe, and no reason to doubt, that Thomas would have received 45½% of what Lesser and Zakin ultimately got, if he had not been deprived by their deceit of the opportunity to participate. Thomas, therefore, is not now to be deprived of his proportional share of the windfall of which Zakin and Lesser were the sole heirs.

There is only one difficulty in applying this test to these facts. The $600,000.00 in cash and notes is an immutable amount. The value of the building is quite another thing. The plaintiff points to the rents to be received from Duralite over a 15-year period, commencing August 1, 1970, totaling $2,575,000.00, which as discounted at the legal rate of interest comes to $1,809,598.79. (Plaintiff's Post-Trial Brief, p. 48)

The Court rejects this method of valuation because it presumes too much of prophecy. Giffen and Duralite are certainly obligated to pay $2,575,000.00 to Lesser and Zakin, as rent until 1985, but that is not to say that they will certainly be able to do so. The value of their *pledge*, in 1970, to perform in the *future*, is the measure of the value *received* by Lesser and Zakin *on July 24, 1970*. The Court cannot decree the future ability of Giffen and Duralite to perform, and must award damages to be paid in the present, whatever the future may bring.

The Court finds by the preponderance of the evidence that, as of July 24, 1970, the date when Lesser and Zakin signed the agreement taking the property back, it was worth at least $1,250,000.00. It may be worth even more today, and it may under some circumstances be worth much less tomorrow, but that cannot be the test. The windfall they received, they received on July 24, 1970. Anything beyond that is beyond this case, as is consideration of the present value of $600,000.00 in cash as opposed to the value of $600,000.00 in cash on July 24, 1970. Thomas is to receive 45½ percent of what Lesser and Zakin got on July 24, 1970; nothing more.

In determining that the value of the property was $1,250,000.00 on July 24, 1970, the Court has considered the fact that it had been originally purchased, in 1960, for $600,000.00; that the New

Jersey State Board of Tax Appeals, on March 12, 1968 (DD–18, Tab 25), had affirmed a valuation of $1,360,000.00; and that Zakin testified it was worth at least $1,000,000.00. What the Court found persuasive was that in their contract of February 28, 1969, Giffen, Lesser and Zakin placed a value of $1,250,000.00 on the property (DD–18, Tab 2, ¶5–7), and that Monroe Cooperman, himself a registered real estate broker (Tr. 3000), testified to the Court that this was a reasonable and appropriate valuation of the property. (Tr. 2974).

Accordingly, the Court finds that Zakin and Lesser on July 24, 1970, received $1,677,150.00 [11a] in value, and that Thomas is entitled to recover 45½% of $1,677,150.00, less the $109,892.81 which he received for his stock in November of 1968, for a total of $653,210.44, plus interest from July 24, 1970.

Inasmuch as the conduct of Lesser and Zakin throughout the Thomas stock transaction is clearly within the purview of Rule 10b–5, and inasmuch as they deliberately shunned the Rule's obligation of full disclosure of all material facts related to the securities transaction, Lesser and Zakin bear personal liability jointly and severally for any damage suffered by the plaintiffs as a result of their failure to make full and fair disclosure of all material facts relevant to the securities transaction.

The question now arises as to whether Duralite is liable as well.

The underlying purpose of the Securities Exchange Act of 1934 was to insure some degree of equalization of bargaining position in securities transactions. This goal applies not only to majority stockholders of corporations, but equally to the corporations when represented by their officers, directors or agents. Kohler v. Kohler Co., 319 F.2d 634, 638 (7th Cir. 1963).

Backed by their combined ownership of over 50% of the Randolph and Duralite stock, Lesser and Zakin proceeded to negotiate and consummate the Thomas stock purchase as the agents of both corporations, and in the name of Randolph, without fear of repudiation by their principals.

Plaintiffs are entitled to impute the fraud of the directors and officers of Randolph Avenue Corporation [12] for the purposes of their claim against the corporation. Affiliated Ute Citizens v. United States, supra, 406 U.S. at 154; Heilbrunn v. Hanover Equities Corporation, 259 F.Supp. 936, 938 (S.D.N.Y. 1966). Cf. S. E. C. v. North American Research and Development Corp., 424 F.2d 63, 79 (2nd Cir. 1970); S. E. C. v. Manor Nursing Centers, Inc., 458 F.2d 1082 (2nd Cir. 1972).

Thus, Randolph's conduct, through its officers and directors, in its purchase of Thomas' stock, violated Section 10(b) of the Securities Exchange Act of 1934 and its regulatory corollary, Rule 10b–5.

Duralite's liability, however, is not co-extensive with that of Lesser and Zakin. Duralite did not reap the windfall profits garnered by Lesser and Zakin. Its passive participation in the defrauding of Thomas was orchestrated by Lesser and Zakin, its majority shareholders. There was no community of interest, sharing of benefit, or joint undertaking between Lesser and Zakin, on the one hand, and the Duralite-Randolph corporate complex, on the other. With these considerations in mind, it is the Court's view that an equitable application of the *Janigan* doctrine demands

---

11a. Lesser and Zakin received the Randolph property subject to a mortgage which ran to Duralite in the amount of $172,850.00 (DD–19). Accordingly, the total value of the property which Lesser and Zakin ultimately received was $600,000.00 in cash and notes and the Randolph property, valued at $1,250,000.00, less the amount of the mortgage, for a total of $1,677,150.00.

12. Subsequent to the consummation of the Thomas stock purchase, Randolph Avenue Corporation was merged into Duralite Company, Inc. As a matter of law, the surviving corporation became liable for all the liabilities, obligations and penalties of each of the constituent corporations. N.Y.Business Corp.Law § 906(b)(3) (McKinney's Consol. Laws, c. 4 1963); N.J.S.A. 14A:10–6(e).

that Duralite not be requested to disgorge fraudulent enrichment it never received.

As the Court has found, the rescission agreement dated July 24, 1970 was the result of threats by Lesser and Zakin to bring a lawsuit against Giffen based on Giffen's inability to honor the basic contract of February, 1969.

There was no effort here by Giffen to shift windfalls into the pockets of Lesser and Zakin, nor to frustrate Thomas. Rather, Giffen found itself unable to honor its earlier agreement to issue Giffen stock, and simply could not afford to give the Duralite and Randoph stock back to Lesser and Zakin.

Under these circumstances, Giffen was in fact compelled by Lesser and Zakin to pay them in cash and an exceedingly favorable net lease, far more than Duralite and Randoph were actually worth.

In such circumstances, the judgment would be fundamentally unjust if it were to go beyond stripping Lesser and Zakin of their windfall profits, and were also to require Duralite (Giffen) to pay an exorbitant price for its own stock twice.

Moreover, such a ruling would not advance the purposes intended by the Supreme Court of the United States in *Affiliated Ute.* There the Court, in a further effort to chill executive fraud and chicanery, adopted a judge-made alternative rule of damages which went beyond merely compensating a defrauded party to the extent of that party's loss, but also reached out, as it were, even to the pocket of the perpetrator of the fraud, beyond that extent necessary merely to recompense the victim, to the end that not only would the victim be made whole but the guilty party would derive no undue benefit, windfall or otherwise, from the product of his fraud.

There has been absolutely no showing made that Duralite (Giffen) was the beneficiary of any windfall. It is this Court's view that in imposing a judgment upon Lesser and Zakin which goes beyond the mere compensation of Thomas, and which additionally strips them of all windfall profits which they received, the Court has applied the policy, spirit and letter of the law as enunciated by the Supreme Court of the United States.

It would serve no purpose to make Duralite (Giffen) responsible for windfall profits when it received no windfall.

Accordingly, the judgment to be presented should reflect this Court's decision that Duralite's (Giffen's) liability be limited to the foregoing first measure of damages, that is, the difference between what Thomas received on November 21, 1968 and the real value of the property on that date, with interest from that date. Janigan v. Taylor, *supra*, 344 F.2d at 786. The Court has found that the market value of the Duralite-Randolph complex in 1968 was approximately $530,000.00, and that the true value of Thomas' interest in 1968 was $45\frac{1}{2}\%$ of that figure. Duralite's liability to Thomas is $45\frac{1}{2}\%$ of $530,-000.00, or $241,150.00, less the $109,-892.81 which Thomas received for his stock in November of 1968, for a total of $131,257.19, plus interest from November 21, 1968.

Duralite, Lesser and Zakin are thus liable jointly and severally to Thomas for the damages incurred by the defendants' violation of Rule 10b–5.

Duralite, however, has cross-claimed against Lesser and Zakin in the event the plaintiffs recover a judgment against it:

Duralite's cross-claim is predicated on the legal proposition that if Thomas succeeds in establishing a violation of Rule 10b–5, it follows as a matter of law that the individuals, in commiting such fraudulent and unauthorized acts as to Thomas and causing injury to Duralite reflected in the form of an adverse judgment, breached their fiduciary duties to Duralite, entitling Duralite to a judgment over against them.

(Duralite Company, Inc. Post-Trial Brief, pp. 151–152)

A corporation is a principal which can be liable for fraud only through the conduct of its agents. Duralite's liability to Thomas, however, attaches only through operation of law; it was not itself *in pari delicto* with its officers and directors, who acted only in their personal interests, albeit in the corporate name. Thus, Duralite is not barred from seeking indemnification from those whose unlawful conduct has saddled it with this vicarious liability. de Hass v. Empire Petroleum Company, 286 F.Supp. 809, 816 (D.Colo.1968); Handel-Maatschappij H. Albert de Bary and Co. N.V. v. Faradyne Electronic Corp., 37 F.R.D. 357, 359 (S.D.N.Y. 1964). *Cf.* Wilshire Oil Company of Texas v. Riffe, 409 F.2d 1277 (10th Cir. 1969).

As directors and officers of Randolph, Lesser and Zakin were fiduciaries and quasi-trustees of the corporation. Hill Dredging Corp. v. Risley, 18 N.J. 501, 114 A.2d 697 (1955). The entire management of corporate affairs was committed to their charge, upon the trust and confidence that those affairs would be managed within the limits of the powers conferred by law upon the corporation, and for the benefit of the corporation. Despite their fiduciary duty to the corporation, Lesser and Zakin, having been exposed to the Kaltsas forecast of Giffen's acquisition of Duralite and after digesting the probable feast available to Duralite shareholders if Giffen did acquire Duralite, deliberately embarked on a course of conduct to mislead Thomas as to the financial prospects of Duralite and Randoph.

This conduct was undertaken not to benefit Duralite or Randolph, on whose behalf they were purportedly acting, but solely to benefit themselves.

The acquisition of Thomas' shares was only for the benefit of Lesser and Zakin; no benefit accrued thereby to Duralite or to Randolph. Under these circumstances we find that Lesser and Zakin breached their fiduciary duty and that Duralite's liability to Thomas is a direct result of this unauthorized and unlawful action. Accordingly, Lesser and Zakin are jointly and severally liable to Duralite for any damages payable by Duralite to Thomas resulting from their unlawful conduct as agents of Duralite.

Duralite has also counterclaimed for goods sold and delivered to Edco and Temco, and for breach of contract for failing to accept certain raw materials and finished goods pursuant to the contracts dated June 18, 1968 and December 31, 1968. By stipulation, the parties have agreed to final judgment in favor of Duralite against Edco and Temco in the amount of $17,175.88 for the goods sold and delivered. The parties have also stipulated that, in the event the contracts are enforceable against Edco and Temco for failure to accept the raw materials, the final judgment in this case will include a judgment against Edco and Temco in favor of Duralite in the amount of $20,000.00. (Tr. 3559)

Edco and Temco resist the obligations imposed under the June 18, 1968 agreement under a claim of invalidity pursuant to Section 29 of the Securities Exchange Act of 1934.

Section 29, 15 U.S.C. § 78cc(b) provides in relevant part:

(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security or an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in vio-

lation of any such provision, rule, or regulation . . . .

Duralite contends that Edco and Temco, being neither purchasers nor sellers in connection with Thomas' sale of his Duralite and Randolph shares, lack standing to press the Rule 10b–5 violation as a basis of invalidity of their contractual obligation to purchase the specified raw materials and inventory.

Amplification of Section 29(b) has been provided by the Supreme Court in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

In *Mills,* minority shareholders of the respondent Electric Auto-Lite brought an action to set aside a merger of Auto-Lite with another corporation which owned over half of Auto-Lite's stock. Having substantiated the fact that the merger proxy statement violated Section 14(a) of the Securities Exchange Act of 1934, the petitioners sought rescission of the consummated merger under Section 29(b) of the Act.

Recognizing the ramifications of such an extreme remedy, the Court stated:

We do not read § 29(b) of the Act, which declares contracts made in violation of the Act or a rule thereunder 'void . . . as regards the rights of' the violator and knowing successors in interest, as requiring that the merger be set aside simply because the merger agreement is a 'void' contract. This language establishes that *the guilty party is precluded from enforcing the contract against an unwilling innocent party,* but it does not compel the conclusion that the contract is a nullity, creating no enforceable rights even in a party innocent of a violation. The lower federal courts have read § 29(b), which has counterparts in the Holding Company Act, the Investment Company Act, and the Investment Advisers Act, as rendering the contract merely voidable at the option of the innocent party. [Citations omitted]

\*  \*  \*  \*  \*  \*

This interpretation is eminently sensible. The interests of the victim are sufficiently protected by giving him the right to rescind; to regard the contract as void where he has not invoked that right would only create the possibility of hardships to him or others without necessarily advancing the statutory policy of disclosure.

\*  \*  \*  \*  \*  \*

In short, in the context of a suit such as this one, § 29(b) leaves the matter of relief where it would be under *Borak* without specific statutory language —the merger should be set aside only if a court of equity concludes, from all the circumstances, that it would be equitable to do so. Cf. SEC v. National Securities, Inc., 393 U.S. 453, 456, 463–464, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969).

396 U.S. at 386–388, 90 S.Ct. at 622–624. (Emphasis added)

The June agreement (P–18) provides in relevant part:

WHEREAS, all the parties recognize that the sale and purchase of the stock in Purchaser [Randolph] and Duralite and the payment of moneys by Edco to Duralite and purchase of said inventory of Duralite by Edco and Temco are interrelated because of the relationship between the parties, and the parties therefore desire to agree upon all of said matters for their ultimate resolution; . . .

It is clear that Edco and Temco were not interlopers in the June 18, 1968 agreement. Both corporations were under the control of Thomas and his partner Edwards, and both entered into their contractual obligations to facilitate the extinction of Thomas' interest in the Duralite-Randolph complex.

Participation by Edco and Temco in the Thomas stock purchase agreement not only provided vicarious consideration to Thomas, as recipient of inventory uniquely suited to his new business enterprises, but also furnished the Duralite-Randolph complex with a

new source of funds needed to finance the buyout of Thomas.

In recognition of the intimate relationship between Thomas and the Edco and Temco corporations existing at the execution of the June 18, 1968 agreement, Edco and Temco, as unwilling innocent parties to the defendants' fraudulent conduct in violation of Rule 10b–5, are entitled to rescind any and all of their obligations incurred under the aforementioned agreement.[13]

Counsel for plaintiff will prepare and submit, on notice, an appropriate order within ten (10) days.

This Opinion constitutes the Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

■ Costs are awarded to Thomas from Lesser and Zakin. Duralite shall bear its own costs.[14]

13. Duralite contends that the agreement of December 31, 1968 (DD–60), to which Thomas was not a party, reaffirms Edco's and Temco's obligation to purchase the goods specified in the June 18, 1968 agreement. The December 31, 1968 agreement is merely an accord between the parties to dispose of disputes centering on the quality and appropriateness of sale and purchase of certain portions of the raw and finished merchandise as contracted in the June 18, 1968 agreement. Because of the genesis of the December 31, 1968 agreement, Edco and Temco are entitled to invoke the protection of Section 29(b) and thus preclude Duralite from enforcing both contracts.
All defendants have asserted that the general release (D–70) running from plaintiffs to defendants is a bar to plaintiffs asserting their rights under the Securities Exchange Act of 1934. We disagree.
Section 29(a) of the Securities Exchange Act specifically voids any condition, stipulation or provision binding a person to waive compliance with any chapter of the Act or of any rule or regulation thereunder. Pearlstein v. Scudder of Germany, 429 F.2d 1136, 1143 (2nd Cir. 1970) ; Special Transportation Services Inc. v. Balto, 325 F.Supp. 1185, 1187 (D.Minn.1971).

14. Pursuant to the standards for the assessment of costs as enunciated by the United States Court of Appeals for the Third Circuit in Fruehauf Corporation v. International Terminal Operating Co. Inc., 505 F.2d 730 (3rd Cir., 1974), we do not assess costs against Duralite. Duralite is a losing party to the extent of over $160,000.00. On the other hand, it is also a prevailing party to the extent that $17,000.00 was awarded in its favor against plaintiffs, the net effect being that Duralite is both a losing and a prevailing party although the figures are, of course, quite out of line with each other and no one would suggest that in sum total it is not a losing party.
However, in light of all the circumstances of this case, including the fact that liability of Duralite is based on imputation of the actions of faithless corporate officers, acting in their own interests to the injury of third parties, the fact that it had meritorious claims against plaintiffs, as reflected in the judgment, which would have undoubtedly been in a greater amount against plaintiffs except that the contract upon which it relied was voided due to the fraud of its officers, it seems to this Court just that Thomas' costs shall be borne entirely by Lesser and Zakin and not by Duralite. Duralite does not ask costs and bears its own costs.